**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

LINDA CARR,                                        :

     Plaintiff,                              :

vs.                                                          :          CA 13-00273-C

CAROLYN W. COLVIN,                      :
Acting Commissioner of Social Security,
                                                              :
     Defendant.

## MEMORANDUM OPINION AND ORDER

The Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 18 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.").) Upon consideration of the administrative record ("R.") (doc. 12), the Plaintiff's brief (doc. 14), the Commissioner's brief (doc. 15), and the arguments presented at the June 27, 2014 hearing, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

---

[1] Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* doc. 18 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.").)

# I.    Procedural Background

On or around May 24, 2010, the Plaintiff filed an application for DIB and SSI (R. 130-31; *see* R. 9), alleging disability relating to the following ailments: back and neck pain, high blood pressure, feet pain, female problems, and nerve pain in her left hip, (*see* R. 160). She stated that she became disabled on May 24, 2010. (R. 130.) Her application was initially denied on July 23, 2010, (R. 57-68). A hearing was then conducted before an Administrative Law Judge on August 31, 2011. (R. 24-46). On November 16, 2011, the ALJ issued a decision finding that the claimant was not disabled (R. 9-20), and, on January 17, 2012, the Plaintiff sought review from the Appeals Council, (R. 186-88). On March 26, 2013, the Appeals Council issued a decision declining to review the ALJ's decision. (R. 1-3.) Therefore, the ALJ's determination was the Commissioner's final decision for purposes of judicial review. *See* 20 C.F.R. § 404.981. The Plaintiff filed a Complaint in this Court on May 22, 2013. (Doc. 1.)

# II.    Standard of Review and Claims on Appeal

In all Social Security cases, the plaintiff bears the burden of proving that he or she is unable to perform his or her previous work. *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the plaintiff has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the plaintiff's age, education, and work history. *Id.* Once the plaintiff meets this burden, it becomes the Commissioner's burden to prove that the plaintiff is capable—given his or her age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985). Although at the fourth step "the [plaintiff] bears the burden of demonstrating an inability to return to his [or her] past relevant work, the

[Commissioner of Social Security] has an obligation to develop a full and fair record." *Shnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted).

The task for this Court is to determine whether the ALJ's decision to deny Plaintiff benefits is supported by substantial evidence. Substantial evidence is defined as more than a scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "In determining whether substantial evidence exists, [a court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 F. App'x 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence." *Id.* (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).

On appeal to this Court, the Plaintiff asserts three claims:

1. The Commissioner's decision should be reversed because the ALJ's residual functional capacity assessment is not supported by substantial evidence;

2. The Commissioner's decision should be reversed because the ALJ failed to complete a psychiatric review technique form and append it to his decision or incorporate it into his findings; and

3. The Commissioner's decision should be reversed because the ALJ failed to properly assess the Plaintiff's complaints of pain.

(Doc. 14 at 2; *see id.* at 6-9.) For the reasons discussed below, the Commissioner's decision denying the Plaintiff benefits should be affirmed.

### III.   <u>Relevant Medical Evidence</u>

Back, leg and neck pain

On May 21, 2002, the Plaintiff presented to her primary care physician with complaints of lower back pain and pain radiating down her left leg. (R. 211.) Her physician prescribed her Celebrex and scheduled her for an MRI of the lumbar spine, (*id.*), which proceeded on June 11, 2002, (R. 275). The results from the MRI indicated mild protrusion of the L5-S1 disc; however, "there was no [marked] encroachment of the existing nerve root." (R. 208, 275.) During a subsequent doctor's visit on June 14, 2002, the Plaintiff reported that the pain down her left leg had improved significantly since she began taking Celebrex. (R. 208.) By the time of her July 15, 2002 visit, her back pain had resolved with conservative treatment. (R. 206.) On November 8, 2002, a radiology examination of her lumbar spine revealed that it was normal. (R. 274.) On July 29, 2003, the Plaintiff presented to Hale County Hospital Clinic with complaints of neck pain and shortness of breath. (R. 239.) The treating physician determined that she had pharyngitis, lethargy, hypertension, shortness of breath, and a history of anemia. (*Id.*) On August 22, 2005, the Plaintiff presented to Hale County Hospital Clinic with complaints of back pain. (R. 236.) Her treating physician determined that she had myofascial spasms of the lumbar spine and prescribed Tylenol and Flexeril. (*Id.*) On December 9, 2008, while being treated at the Marion Rural Health Center for cold symptoms/chest congestion, the Plaintiff also reported complaints of back and hip pain. (R. 251-52.)

Hypertension

Routine office visits to the Plaintiff's primary care physician at Marion Clinic in 2002-06 indicated findings of obesity and hypertension, as well as ongoing treatment for her hypertension with Hydrochlorothiazide (HCTZ). (R. 194-205.)

On April 5, 2011, the Plaintiff was seen by a nurse practitioner at Taylor Internal Medicine of Selma ("Taylor Internal Medicine") for her hypertension. (R. 283, 285.) The Plaintiff reported that she "[has] pain all over [her] body, that is worse in the mornings, and [she is] out of [her] blood pressure medicine." (R. 283.) The Plaintiff's blood pressure was elevated at the time of the visit. (*Id.*) The Plaintiff reported that she had not taken her blood pressure medication for one month. (*Id.*) She also reported "that she has an occasional headache at times, [and] they usually resolve on their own." (*Id.*) It was determined that the Plaintiff had "benign essential hypertension" and "pain in joint involving multiple sites." (*Id.*)[2] She was prescribed HCTZ, Meloxicam and Ibuprofen, and she was told to return to the office in one week to have her blood pressure rechecked. (*Id.*) However, there is no evidence that she ever returned for a follow-up visit, as directed. (*See* R. 281-85.) The April 5, 2011 visit was her only visit to Taylor Internal Medicine. (*Id.*)[3]

On June 23, 2011, the Plaintiff was seen in the emergency room for chest pains. (R. 288.) Her blood pressure at that time was 138/88. (*Id.*)

<u>Tendinitis/arthritis</u>

In March and April of 2002, the Plaintiff was treated for left hand pain. (R. 238, 240-41.) Her treating physician determined that she had tendinitis of the small finger of her left hand and possible arthritis of her left hand and wrist; she was prescribed

---

[2] The Plaintiff was assessed by Nurse Practitioner Latoya Russell at the time of the visit. (R. 283, 285.) Dr. Bruce Taylor subsequently reviewed and signed Ms. Russell's assessment on April 20, 2011. (*Id.*)

[3] The Taylor Internal Medicine records include a page that was generated on June 23, 2011, when the records were released to the Plaintiff's attorneys. (R. 281.) That page includes a "problem list" with entries for both "benign essential hypertension" and "malignant essential hypertension." (*Id.*) Notably, the Plaintiff was not diagnosed with malignant essential hypertension at the time of her only visit and treatment at Taylor Internal Medicine. (R. 183, 185.)

Tylenol and Indocin, an anti-inflammatory. (R. 238.) On June 13, 2010, the Plaintiff was treated in the emergency room at Hale County Hospital for arthritis in her right hand. (R. 258-67.) She was given Toradol for her pain. (R. 263.)

Gynecological problems

On September 5, 2002, after being diagnosed with "[d]ysfunctional uterine bleeding and cramping," the Plaintiff underwent a "diagnostic laparoscopy with bilateral tubal ligation," as well as a cervical curettage, an endometrial curettage, and uterine ablation. (R. 277-78.) On December 11, 2009, the Plaintiff was seen for complaints of having an irregular menstrual cycle and excessive bleeding. (R. 249.) On June 23, 2011, while being treated for complaints of chest pain, the Plaintiff reported a history of uterine fibroids. (R. 287-88.)

Testimony of Dr. James Anderson

Dr. Anderson testified as a medical expert witness at the time of the August 31, 2011 hearing before the ALJ. (R. 35-42.) Dr. Anderson opined that

> [The Plaintiff is] morbidly obese – 61 inches, 295 pounds – [and] she has obesity related lower back pain treated symptomatically. She has hypertension which is asymptomatic, and she has chronic pelvic pain due to benign gynecological problems with iron deficiency anemia. Anemia is treated successfully with iron replacement tablets. She also has several episodes of generalized pain treated with anti-inflammatory medications. The records that we have, includ[ing] those submitted today, in my view would not meet or equal . . . disability.

(R. 36.)

With regard to the protrusion of the L5-S1 disc, indicated in the 2002 MRI, Dr. Anderson testified that such protrusion "is a disc pathology that may or may not be symptomatic." (R. 37.) Furthermore, Dr. Anderson discounted the finding of disc protrusion on the 2002 MRI because of the age of the MRI. (R. 40.) He stated that "something almost a decade old is not really of clinical significance" because, over time,

"abnormal disc disease can get better [or] worse." (R. 40-41.) For example, he stated that "[d]iscs that protrude . . . can grind down and become asymptomatic." (R. 41.) He explained that a determination as to whether disc protrusion is symptomatic is based on the "longitudinal treating record." (*Id.*)

Additionally, Dr. Anderson testified that the diagnosis of tendinitis in the Plaintiff's hands is "a reasonable clinical explanation for her hand pain. (R. 39.) He stated that tendinitis "is a clinical diagnosis and it's treated symptomatically." (*Id.*)

## IV.   ALJ's Decision

On November 16, 2011, the ALJ issued a decision finding that the Plaintiff is not disabled. (R. 9-17.) In reaching his decision, the ALJ found that the Plaintiff has not engaged in substantial gainful activity since the alleged onset date of May 24, 2010. (R. 11.) The ALJ found that the Plaintiff "has the following severe impairments: morbid obesity; arthritis; and occasional myofascial spasms of the spine." (*Id.* (emphasis omitted).) The ALJ discussed his findings regarding the Plaintiff's severe impairments as follows:

> The undersigned notes that the vast majority of the medical evidence was generated prior to 2007. The medical evidence contemporary with alleged onset through the date of this decision is scarce with approximately five visits for medical care over the course of the last four years. The claimant's pursuit of medical care is not consistent with her allegations.

> Nonetheless, the medical expert opined, in part, that the record does indicate the impairments listed above. He further opined that these impairments are more than slight abnormalities that cause more than slight limitation in her capacity to perform work activity. They are therefore severe.

> He also confirmed that there is evidence of some gynecological dysfunction possibl[y] resulting from uterine fibroids, anemia, and hypertension. However, he concluded that her hypertension was asymptomatic. He further advised that her anemia was resolved via treatment. He offered the same opinion regarding pain secondary to her gynecological dysfunction.

The undersigned carefully reviewed the medical evidence and concurs that there is no indication of ongoing or recurring gynecological dysfunction. The claimant was last treated for a gynecological issue—excessive bleeding—in December 2009. There is no evidence of any additional complaints or any residuals subsequent to treatment at that time. The undersigned concludes that her history for gynecological dysfunction is a slight abnormality that does not appear to cause more than slight, if any, limitation in her ability to perform work activity. It is therefore nonsevere.

The undersigned did not find any recent evidence indicating the presence of any anemic condition. Consistent with the medical expert's report, there has certainly been no treatment between 2008 and the date of this decision. The undersigned concludes that her distant history for anemia is at best a slight abnormality that does not cause more than slight, if any, limitation in her ability to perform work activity. It is therefore nonsevere.

The record in general indicates that the claimant does experience hypertension. However, the record also shows that the claimant has not maintained regular medication compliance. The claimant has reported allowing lapses of several weeks before procuring the necessary medication. Spikes in her measurements are consistent with these periods. However, her most recent scores are lower and suggest recent compliance.

Additionally, even during the periods of elevation the record is void of any secondary problems such as hypertension-related vision, heart, or damage to extremities. Therefore, the undersigned concurs with the medical expert and finds that her hypertension is asymptomatic. It is therefore a slight abnormality that causes slight, if any, limitation in her ability to perform work activity. It is therefore nonsevere.

The undersigned notes that the claimant completed a functional report with some suggestion of mental impairment. However, State agency personnel contacted her and the claimant advised that the reported symptoms only accompany periods of pain . . . . She did not allege any mental impairment in her disability report or appeal. The undersigned finds that there is no medically determinable evidence or symptoms and signs suggesting the existence of a mental impairment.

(R. 11-12.)

The ALJ concluded that the Plaintiff did not meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1, (R. 12), and made the following findings with respect to the Plaintiff's residual functional capacity:

**[T]aking the claimant's obesity into consideration, the claimant has the residual functional capacity to perform nearly the full range of Light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant can sit between one and two hours uninterrupted and for a total of six hours over the course of an eight hour workday. The claimant can stand and/or walk between 30 minutes and one hour uninterrupted, and for a total of four-to-six hours over the course of an eight-hour workday. The claimant can lift, carry, push, and pull up to 10 lbs frequently, and 20 lbs occasionally. The claimant can frequently use her upper extremities for simple grasping and fine manipulation. She can occasionally use her lower extremities for repetitive motions such as operating foot controls or pushing and pulling. She can occasionally bend, stoop, crawl, kneel, crouch, and balance. The claimant is expected to experience mild-to-moderate pain, which occasionally interferes with her concentration, persistence and pace, where mild is defined as a condition which does not affect the ability to function, moderate defined as a condition or impairment which affects but which does not preclude the ability to function (work), and occasionally means occurring up to 1/3d of an 8 hour day, which is a cumulative concept, and is not continuous for any period of time, only means occasional. She can occasionally climb ramps and stairs. She can occasionally climb ladders, ropes, and scaffolds. The claimant cannot work around hazardous machinery or operate commercial motorized vehicles. The claimant must avoid concentrated or excessive exposure to pulmonary irritants such as dust, odors, fumes, humidity, and extremes in temperature and the like.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical

evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant alleges that she suffers back, neck, feet and nerve pain. The nerve pain is in her left hip. She also experiences female problems and high blood pressure. She added that she is 5'6" and weighs 295 lbs (Exhibit 3E, pg 2). Despite her allegations as to onset, May 2010, she added that she stopped working in October 2008, for reasons unrelated to her disabling impairments. She reported that she went to get some medicine and was fired from her job. Nonetheless, she believes she became unable to work as of the alleged onset date (Id.).

The undersigned notes that to her credit the claimant worked every year between 1986 and 2008; and enjoyed substantial gainful activity between 1987 and 2008, for over twenty years (Exhibit 7D). She provided no other evidence regarding her report that she was fired because she went to get medication. The undersigned finds that this statement does seem credible. Nonetheless, as noted, her work history did lend some weight to her allegations. However, it did not lift her credibility to the extent that it overcame the medical evidence and other evidence of record.

By way of example, Agency records indicate that she reported self-employment earnings of $9,837.00 in 2009; however, that income was then subtracted resulting in zero earnings in 2009. While this change is unclear—along with her reports—it begs the question why she did not work at all between 2008 and May 2010, if in fact she did not become disabled until May 2010. Per her reports, she was not limited until May 2010. Absent medical activity in support of her allegations, there is no indication why the claimant chose not to work for almost two years. The medical evidence does not support that decision.

The claimant reported that she stopped working on October 24, 2008, after leaving work or not reporting to work, opting to obtain medication (Exhibit 3E). However, the earliest evidence of medical care is treatment on December 9, 2008. She reported cold symptoms with headache with onset of one week. She also reported low back and right hip pain radiating down her right leg, with onset of two-to-three days (Exhibit 3F, pg 8). Neither report suggests chronic or ongoing impairment that would have prompted abandoning work two months earlier.

The resulting physical examination revealed abnormality regarding her chest and lungs. The neurological and musculoskeletal examinations were unremarkable. She was assessed for bronchitis (Id.). The undersigned notes that this examination was two months after she allegedly left work to procure medication. However, it does suggest that a longstanding impairment did not prompt her action. In fact, her provider maintained a medication sheet. It is blank (Id. at 9). However, this may have actually been an initial visit. She completed a health history report. She did report high blood pressure and back pain. She did not

indicate any neck, feet, or female problems. She did not indicate any hospitalizations (Id. at 7).

Per the record submitted by this provider, the claimant did not visit again until December 11, 2009, approximately one-year later, and then she complained of an irregular cycle. She also reported that previous excessive bleeding resulted in uterine cauterization (Id. at 5). She also reported that she had been without her blood pressure medication for three weeks and her pressure was elevated (Id.). This is curious in that the claimant allegedly lost her job because she insisted on procuring medication presumably during working hours. However, a year later, without work as an obstacle, she let her prescription lapse for three weeks.

More importantly, she did not mention any problems involving her back, neck, hips, or feet (Id.). The lack of care over the course of a year, combined with her actual complaints at the end of that year, strongly suggest that there was no chronic impairment and limitation. Additionally, the visit in December 2009, does not indicate future depreciation or indication such that she would be disabled within six months. The claimant reported that she visited a provider regarding leg and back pain in March 2010, two months before alleged onset (Exhibit 3E, pg 5). However, the undersigned scoured the record and found no evidence of any such treatment.

Per the available record, the claimant sought medical care once in December 2008 and once in December 2009. There is no evidence of any care during the six months leading up to the alleged onset. As noted, the results of the two visits do not indicate any disabling impairment, or severe limitation. The document does show that she weighed 307 lbs on both occasions (Exhibit 3F, pg 4).

The record simply does not contain either linear or contemporary evidence consistent with alleged onset. The undersigned notes that as pointed out above, the onus is upon the claimant to provide medically determinable evidence of impairment and limitation consistent with her allegations. While this Agency and the State agency are required to assist her in collecting and presenting such evidence, the onus is upon the claimant to provide the sources that possess such evidence. The record reveals that the State agency made every effort to collect evidence from the sources she identified. The numerous sources all provided evidence reflecting care prior to December 2009. In fact, most of the evidence involves treatment during the period that she enjoyed substantial gainful activity.

In June 2010, the claimant visited a local emergency room. She complained of arm and hand pain (Exhibit 5F, pg 3). The undersigned digresses briefly to note that this pursuit of medical care actually detracts from her allegations. The claimant reported that disabling pain unrelated to her arms and hands, caused her inability to work. However, there are

no emergency room visits contemporary with alleged onset—or the period leading up to alleged onset—regarding the impairments she insists disable her. The lack of emergency care, or even much routine care, reference to her allegedly disabling impairments, combined with the fact that when she experienced pain that did prompt an emergency room visit, detracts greatly from her allegations.

During the visit, the notes indicate that she reported past history for hypertension and nothing else. She made no reference to neck, back, hip or leg pain. She did not mention a negative gynecological history. Physical examination of her spine revealed muscle spasms. Examination of her extremities was unremarkable. Ultimately, it appears that she was diagnosed with arthritis. However, two other illegible entries were made; nonetheless, discharge instructions listed only arthritis. She was instructed to visit her primary provider. There were no additional instructions as to activities (Id. at 11). She concurred with the instructions.

The State agency denied her claim in July 2010. The claimant appealed. In her appeal, she reported that there had been a change in her conditions. She was experiencing increased foot pain and numbing in her feet. She advised that she began to experience this change on August 1, 2010 (Exhibit 8E, pg 1). She also reported that her impairments caused her to be very slow while dressing. She does not cook anymore. She spends most of her time in bed. She does light chores when she feels up to it (Id. at 3). Per the record, this change occurred approximately one week after her claim was denied.

She denied any new physical or mental impairments (Id. at 1). More importantly, despite her allegation of additional pain and limitation, she reported that she had not pursued any additional care consistent with her complaint of increased symptoms (Id. at 2). She did advise that was taking a medication for high blood pressure. She was also taking Naproxen for pain (Id.). The undersigned notes that Naproxen is basically an over the counter medication. It is not a narcotic. The claimant's failure to pursue any additional medical care lends very little weight to her new symptoms. The undersigned finds that if her impairments limited her such that frequent, if not constant, bed rest was suggested, then pursuit of medical care was called for, just as it was called for when her hands and arms caused her to pursue emergency care. The undersigned notes that two years earlier the claimant allegedly lost her job by pursuing medications. It is simply not consistent that per her appeal she did not possess the same motivation, despite her allegations.

Despite her allegations and appeal, the claimant did not seek any additional care for an additional year. The record indicates that she visited a routine provider on April 5, 2011. The notes reveal that she was a new patient. She complained of diffuse pain, worse in the morning, and she was out of blood pressure medications (Exhibit 9F, pg 4). The undersigned notes that the record strongly suggests a pattern of

noncompliance in relationship to her hypertension medications. She did not report any female health issues. During review of systems, she reported occasional headaches that resolve without apparent intervention. She reported that she was assessed for a hip problem a "couple years" earlier (Id.). There is no medical evidence of a hip problem between 2009 and the visit. She did not report any additional symptoms.

Physical examination revealed that consistent with noncompliance, her blood pressure was 170/100. She weighed 295 lbs. She was in no acute distress. The examiner did not report any indication for diffuse pain. Nonetheless, the nurse practitioner assessed benign essential hypertension and pain in joints at multiple sites (Id. at 4). She was prescribed a medication for her hypertension. As to pain, she was prescribed Meloxicam and Ibuprofen. Once again she was not prescribed any narcotics. The undersigned notes that a supervising doctor did review and concur in the nurse's actions (Id. at 6). The claimant was not directed to restrict any activities. She was directed to return in one week to recheck her blood pressure (Id. at 4).

The undersigned notes that when the records were released to the representative the problem list reflected benign and malignant essential hypertension. However, the only date of service was the visit on April 5, 2011 (Id. at 2). The treatment notes, discussed above, contain no reference or indication for malignant hypertension. However, more importantly, the notes indicate that the records were provided to the representative in June 2011. There is no indication of a second visit, i.e., the return in one week to recheck her blood pressure (Id.). As indicated above, the record suggests minimal compliance regarding her blood pressure.

Also in June of this year, the claimant visited a local emergency room. She complained of chest pain with radiation into her left arm (Exhibit 10F). As to history she noted history of back problems, arthritis, and uterine fibroids (Id. at 3). Physical examination revealed that her blood pressure was 138/88. Her weight was 285 lbs. Her thyroid was prominent. A second grade murmur was noted. X-rays of her chest were unremarkable (Id. at 5). She was in no respiratory distress, with normal breath sounds. As to her heart, there was regular rate and rhythm, with a grade 2 murmur noted. Her diagnosis was chest pain, with metromenorrhagia, and she was referred to see Dr. Russell.

In light of the general lack of evidence overall, the undersigned enlisted the aid of the medical expert noted above. He reviewed the evidence of record including the older evidence detailing treatment during the period of substantial gainful activity.

He opined that the record indicates morbid obesity, uterine fibroids, hypertension, low back pain secondary to obesity, periodic pain secondary to gynecological problems, resolved, and iron deficiency anemia, resolved. The undersigned notes that he specifically noted

uterine fibroids secondary to the claimant's reports during the latest treatment note above. He opined that she was limited to light work as described above.

The undersigned considered the claimant's testimony and written reports of limitation (i.e. the functional report). Although the claimant asserts greater limitation, her subjective reports are simply not supported by or consistent with the medical and objective evidence of record. Her subjective reports standing alone cannot overcome the remaining evidence.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In sum, the above residual functional capacity assessment is supported by the medical expert's opinion as well as the lack of any significant medical evidence to the contrary. The claimant's obesity has been considered in making this assessment. It is noted that the claimant is a younger individual and it is not unreasonable to expect that with proper diet and exercise, medically supervised, that this claimant could improve her overall health as well as her physical condition, such that she should be capable of greater exertion work, should she choose to diet and exercise.

(R. 13-18 (emphasis in original).)

Based on the testimony of the vocational expert, the ALJ concluded that the Plaintiff could not perform her past relevant work as a fish filleter or janitor, but that she can perform "other work that exists in significant numbers in the national economy." (*Id.* at 18-19.) Thus, the ALJ determined that the Plaintiff is not disabled. (*Id.* at 19.)

## V. Analysis

### A. RFC – Substantial Evidence

The Plaintiff argues that "[t]he ALJ's [RFC] assessment is not supported by substantial evidence because the ALJ erred in ignoring the impact of [the Plaintiff's]

mental impairment, hypertension, tendinitis and arthritis in her functional abilities." (Doc. 14 at 2 (emphasis omitted).)

The Eleventh Circuit has made clear that "[r]esidual functional capacity, or RFC, is a medical assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." *Peeler v. Astrue,* 400 F. App'x 492, 493 n.2 (11th Cir. Oct. 15, 2010) (citing 20 C.F.R. § 416.945(a)). Stated somewhat differently, "[a] claimant's RFC is 'that which [the claimant] is still able to do despite the limitations caused by his . . . impairments.'" *Hanna v. Astrue,* 395 F. App'x 634, 635 (11th Cir. Sept. 9, 2010) (quoting *Phillips v. Barnhart,* 357 F.3d 1232, 1238 (11th Cir. 2004)). The responsibility for making the RFC determination rests with the ALJ. *Compare* 20 C.F.R. §§ 404.1546(c) & 416.946(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.") *with, e.g., Packer v. Comm'r, Soc. Sec. Admin.,* 542 F. App'x 890, 891-892 (11th Cir. Oct. 29, 2013) (per curiam) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." (internal citation omitted)). A plaintiff's RFC—which "includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, co-workers and work pressure[]"—"is a[n] [] assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related

symptoms." *Watkins v. Comm'r of Soc. Sec.*, 457 F. App'x 868, 870 n.5 (citing 20 C.F.R. §§ 404.1545(a)-(c), 416.945(a)-(c)). "In making an RFC determination, the ALJ must consider all the record evidence, including evidence of non-severe impairments." *Hanna*, 395 F. App'x at 635 (citation omitted); *compare* 20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1) (2011) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.") *with* 20 C.F.R. §§ 404.1545(a)(3) & 416.945(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence.").

In this case, the ALJ made the following determination with regard to the Plaintiff's RFC:

> [T]aking the claimant's obesity into consideration, the claimant has the residual functional capacity to perform nearly the full range of Light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant can sit between one and two hours uninterrupted and for a total of six hours over the course of an eight hour workday. The claimant can stand and/or walk between 30 minutes and one hour uninterrupted, and for a total of four-to-six hours over the course of an eight-hour workday. The claimant can lift, carry, push, and pull up to 10 lbs frequently, and 20 lbs occasionally. The claimant can frequently use her upper extremities for simple grasping and fine manipulation. She can occasionally use her lower extremities for repetitive motions such as operating foot controls or pushing and pulling. She can occasionally bend, stoop, crawl, kneel, crouch, and balance. The claimant is expected to experience mild-to-moderate pain, which occasionally interferes with her concentration, persistence and pace, where mild is defined as a condition which does not affect the ability to function, moderate defined as a condition or impairment which affects but which does not preclude the ability to function (work), and occasionally means occurring up to 1/3d of an 8 hour day, which is a cumulative concept, and is not continuous for any period of time, only means occasional. She can occasionally climb ramps and stairs. She can occasionally climb ladders, ropes, and scaffolds. The claimant cannot work around hazardous machinery or operate commercial motorized vehicles. The claimant must avoid concentrated or excessive exposure to pulmonary irritants such as dust, odors, fumes, humidity, and extremes in temperature and the like.

(R. 13-14 (emphasis omitted).)

To find that the ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has "'provide[d] a sufficient rationale to link'" substantial record evidence "'to the legal conclusions reached.'" *Ricks v. Astrue*, No. 3:10-cv-975-TEM, 2012 WL 1020428, *9 (M.D. Fla. Mar. 27, 2012) (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)); *compare id. with Packer v. Astrue*, Civil Action No. 11-0084-CG-N, 2013 WL 593497, *4 (S.D. Ala. Feb. 14, 2013) ("'[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work.'"), *aff'd*, 542 F. App'x 890 (11th Cir. Oct. 29, 2013)[4]; *see also Hanna v. Astrue*, 395 F. App'x at 636 ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review. . . . Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not provide a meaningful basis upon which we can review [a plaintiff's] case." (internal citation omitted)).[5] The

---

[4]    In affirming the ALJ, the Eleventh Circuit rejected Packer's substantial evidence argument, noting, she "failed to establish that her RFC assessment was not supported by substantial evidence[]" in light of the ALJ's consideration of her credibility and the medical evidence. *Packer*, 542 F. App'x at 892.

[5]    It is the ALJ's (or, in some cases, the Appeals Council's) responsibility, not the responsibility of the Commissioner's counsel on appeal to this Court, to "state with clarity" the grounds for an RFC determination. Stated differently, "linkage" may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the Commissioner's decision. *See, e.g., Durham v. Astrue*, Civil Action No. 3:08CV839-SRW, 2010 WL 3825617, *3 (M.D. Ala. Sept. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e] what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision] when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'" (quoting *Hanna*, 395 F. App'x at 636) (internal quotation marks omitted)); *see also id.* at *3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ **could have** relied . . . . There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion]. However, because the ALJ did not state his reasons, the

ALJ's RFC assessment need not be supported by the assessment of an examining or treating physician. *See, e.g., Packer, supra,* 2013 WL 593497, at *3 ("[N]umerous courts have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician."); *McMillian v. Astrue,* CA No. 11-00545-C, 2012 WL 1565624, *4 n.5 (S.D. Ala. May 1, 2012) (noting that decisions of this Court "in which a matter is remanded to the Commissioner because the ALJ's RFC determination was not supported by substantial and tangible evidence still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that substantial and tangible evidence must—in all cases—include an RFC or PCE from a physician" (internal punctuation altered and citation omitted)); *but cf. Coleman v. Barnhart,* 264 F. Supp. 2d 1007 (S.D. Ala. 2003).

Here, the ALJ conducted a lengthy analysis of all the evidence of record. (R. 11-18.) Although the Plaintiff contends otherwise, the ALJ addressed all of the Plaintiff's alleged impairments, including hypertension,[6] (*id.* at 12, 17), and arthritis,[7] (*id.* at 16).[8]

---

court cannot evaluate them for substantial evidentiary support. Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not conduct the analysis that the law requires him to conduct." (emphasis in original)); *Patterson v. Bowen,* 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.").

[6]     The Plaintiff argues that the ALJ did not appreciate the limitations imposed by her hypertension. (Doc. 14 at 2-3.) However, the ALJ considered all the evidence of hypertension, (*see* R. 12, 17), but ultimately agreed with the medical expert that the Plaintiff's hypertension is asymptomatic. (*Id.*) The ALJ stated as follows:

The record in general indicates that the claimant does experience hypertension. However, the record also shows that the claimant has not maintained regular medication compliance. The claimant has reported allowing lapses of several weeks before procuring the necessary medication. Spikes in her measurements are consistent with these periods. However, her most recent scores are lower and suggest recent compliance.

Additionally, even during the periods of elevation the record is void of any secondary problems such as hypertension-related vision, heart, or damage to extremities. Therefore, the undersigned concurs with the medical expert and

As the ALJ discussed, the Plaintiff's medical records contain very little evidence of treatment related to the impairments asserted by the Plaintiff. (*See id.* at 11 ("The undersigned notes that the vast majority of the medical evidence was generated prior to 2007. The medical evidence contemporary with alleged onset through the date of this decision is scarce with approximately five visits for medical care over the course of the last four years. The claimant's pursuit of medical care is not consistent with her allegations."); *id.* at 16 ("[T]here are no emergency room visits contemporary with alleged onset—or the period leading up to alleged onset—regarding the impairments she insists disable her. The lack of emergency care, or even much routine care, . . . detracts greatly from her allegations."); *id.* ("The claimant's failure to pursue any additional medical care lends very little weight to her new symptoms."); *id.* at 17 ("Despite her allegations and appeal, the claimant did not seek any additional care for an additional year."). Due to "the general lack of evidence overall," the ALJ retained a medical expert, Dr. Anderson, to review the medical evidence and provide his opinion regarding the Plaintiff's alleged impairments. (*Id.* at 17.) Dr. Anderson opined that, despite the Plaintiff's obesity-related back pain and certain other ailments, she is not disabled. (*Id.* at 36; *see id.* at 17.) The ALJ stated that his RFC determination "is

---

finds that her hypertension is asymptomatic. It is therefore a slight abnormality that causes slight, if any, limitation in her ability to perform work activity. It is therefore nonsevere.

(*Id.* at 12.)

[7]      The ALJ does not specifically reference tendinitis; however, the only references to tendinitis in the medical records were in 2002, (R. 238). The medical records from the Plaintiff's more recent treatment for her hand pain—a single emergency room visit on June 13, 2010—indicate that she was seen for arthritis, rather than tendinitis. (R. 267.)

[8]      The ALJ addressed the Plaintiff's claim that she suffered from a mental impairment, but ultimately found "that there is no medically determinable evidence or symptoms and signs suggesting the existence of a mental impairment." (R. 12.) The Plaintiff's mental impairment claim is discussed further below. *See infra* § V.B.

supported by [Dr. Anderson's] opinion as well as the lack of any significant medical evidence to the contrary." (*Id.* at 18.)

Furthermore, the ALJ considered the Plaintiff's own reports regarding her limitations, but concluded that her assertions were not consistent with the medical evidence. (*Id.* at 18 ("The undersigned considered the claimant's testimony and written reports of limitation (i.e. the functional report). Although the claimant asserts greater limitation, her subjective reports are simply not supported by or consistent with the medical and objective evidence of record. Her subjective reports standing alone cannot overcome the remaining evidence. After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.").)

The ALJ's analysis demonstrates that he appropriately considered the Plaintiff's condition as a whole and sufficiently linked his RFC determination to the medical evidence of record. The linkage requirement is simply another way to say that, in order for this Court to find that an RFC determination is supported by substantial evidence, ALJs must "show their work" or, said somewhat differently, show *how* they applied and analyzed the evidence to determine a plaintiff's RFC. *See, e.g., Hanna*, 395 F. App'x at 636 (an ALJ's "decision [must] provide a meaningful basis upon which we can review [a plaintiff's] case"); *Ricks*, 2012 WL 1020428, at *9 (an ALJ must "explain the basis for his decision"); *Packer*, 542 F. App'x at 891-892 (an ALJ must "provide *enough reasoning* for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole[]" (emphasis added)). Here, the ALJ "showed his work" and

thereby provided the required "linkage" between the record evidence and his RFC determination necessary to facilitate this Court's meaningful review of his decision.

**B. Failure to Complete PRTF**

The Plaintiff argues that the ALJ erred by failing to complete a Psychiatric Review Technique Form ("PRTF") and append it to his decision or incorporate it into his findings.[9] (Doc. 14 at 5-6.) The Plaintiff relies on the Eleventh Circuit's decision in *Moore v. Barnhart*, 405 F.3d 1208 (11th Cir. 2005). (*See* doc. 14 at 5-6 (citing *Moore*, 405 F.3d at 1214).)

In *Moore*, the Eleventh Circuit "h[e]ld[] that where a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete a PRTF and append it to the decision, or incorporate its mode of analysis into his findings and conclusions." *Moore*, 405 F.3d at 1214. The Eleventh Circuit did not state what constitutes a colorable claim of mental impairment, *see id.*, and it has not addressed the issue in a subsequent opinion. However, this court and other district courts in the Eleventh Circuit have found that plaintiffs have failed to present colorable claims of mental impairments in cases involving stronger evidence of mental impairments than is found in this case. *See Jackson v. Astrue*, Civil Action No. 11-0533-N, 2012 WL 4212209, at *2, 7 (S.D. Ala. Sept. 18, 2012) (finding that the plaintiff had not raised a colorable claim of a mental impairment where the plaintiff had discussed depression in her original application and at the time of the hearing; depression was referenced once in her medical records; the plaintiff had not been diagnosed with

---

[9]      The technique "dictated by the PRTF . . . requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts four functional areas: 'activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005) (citing 20 C.F.R. § 404.1520a-(c)(3-4)).

depression or any other mental disorder; and the ALJ found that plaintiff's mental condition was not severe); *Meadows v. Astrue*, Civil Action File No. 1:09-CV-2656-JFK, 2010 WL 3614157, at *6 (N.D. Ga. Sept. 7, 2010) ("[Plaintiff's primary care physician] prescribed [medication for depression], and a number of times listed [that drug] as one of [p]laintiff's many medications.  However, [her physician] only mentioned depression on one occasion . . . .  He also noted anxiety in the same . . . treatment note and in another note . . . . These two notations include no explanation but only list the words 'anxiety' and 'depression,' and they are buried in treatment notes. . . . Not only is there a paucity of evidence supporting [p]laintiff's allegations of mental impairments, but as the ALJ pointed out in his decision, [p]laintiff has not sought any mental health treatment even though she alleges suicidal ideation, panic attacks, and crying spells. . . . Given the lack of mental health treatment and the fact that the record contains only two isolated notations of mental impairments, made by [p]laintiff's primary care physician, the court finds that [p]laintiff has not presented a colorable claim of mental impairment. As a result, the ALJ committed no error when he did not make PRTF findings." (citations and footnote omitted)); *Sesberry v. Astrue*, No. 3:08-cv-989-J-TEM, 2010 WL 653890, at *3 (M.D. Fla. Feb. 18, 2010) ("In this case, unlike *Moore*, [p]laintiff failed to present a colorable claim of a mental impairment.  In review of the record as a whole, the Court found only two notations by medical doctors that even hint of the possibility that [p]laintiff might suffer from a mental impairment.  On [one visit] [p]laintiff apparently reported a past medical history of hypertension and depression . . . . [During] a follow-up visit . . . [p]laintiff reported that he had trouble sleeping due to '[h]is emotional state' and 'at times he feels depressed' from the disappointment he felt with the treatment he had received for his back pain.  [Plaintiff's physician] referred [p]laintiff for a psychiatric . . . evaluation and prescribed the antidepressant Elavil.

There is no evidence in the record [p]laintiff ever saw [a] psychiatrist, psychologist or counselor for his asserted depression." (citations omitted)).

In this case, the Plaintiff argues that the Plaintiff's mental impairment is apparent from the record, which includes her reports of moodiness. (Doc. 14 at 2-3.) The undersigned disagrees. In her functional report, the Plaintiff noted that she was "moody" and was arguing with others more frequently since her illnesses began. (R. 172.) The Plaintiff subsequently reported to state agency personnel that, when she is experiencing back or arm pain, she has difficulty concentrating, completing tasks, and getting along with others. (*Id.* at 279.) However, she stated that she does not experience those problems when she takes her pain medication and feels better physically. (*Id.*) The ALJ considered this evidence and stated as follows:

> The undersigned notes that the claimant completed a functional report with some suggestion of mental impairment. However, State agency personnel contacted her and the claimant advised that the reported symptoms only accompany periods of pain . . . . She did not allege any mental impairment in her disability report or appeal. The undersigned finds that there is no medically determinable evidence or symptoms and signs suggesting the existence of a mental impairment.

(*Id.* at 12.) The ALJ's finding is supported by the record. The Plaintiff has never been diagnosed with a mental impairment and never been treated for symptoms related to a mental impairment. Indeed, the Plaintiff's medical records do not include a single reference to a mental impairment of any kind. (*See id.* at 191-302.)

Significantly, the Plaintiff has not clearly identified a mental impairment or disorder from which she claims to suffer. At the hearing before the ALJ, the Plaintiff testified that she has mood swings related to her irregular menstrual cycles.[10] (*Id.* at 31.) In her brief, the Plaintiff states that "[t]he medical records are replete with references to

---

[10]    The Plaintiff also testified that she never sought mental health treatment for any reason. (*Id.* at 28.)

[her] female problems that affect her emotionally."  (Doc. 14 at 2 (citing R. 160, 202, 249, 277-78, 288).)  While the records cited by the Plaintiff reflect gynecological treatment,[11] none of those records indicate that her gynecological issues "affect[ed] her emotionally."  (*See* R. 160, 202, 249, 277-78, 288.)  The Plaintiff appears to argue that, despite the utter lack of medical evidence supporting a mental impairment claim, the Plaintiff's mental impairments can be presumed in this case in light of her "female problems" and gynecological treatment.  The undersigned declines to accept such an absurd presumption.

Because the Plaintiff has not clearly articulated a mental impairment, has never been diagnosed with a mental impairment, and has never been treated for a mental impairment, she has not raised a colorable claim.  *See Jackson*, 2012 WL 4212209, at *2, 7; *Meadows*, 2010 WL 3614157, at *6; *Sesberry*, 2010 WL 653890, at *3.  Therefore, the ALJ was not required to complete a PRTF or incorporate its mode of analysis into his findings and conclusions.  *See Moore*, 405 F.3d at 1214.

### C.  Application of the Pain Standard

The Plaintiff's third argument on appeal is that the ALJ failed to properly evaluate the Plaintiff's subjective complaints of back, hip and nerve pain.  (Doc. 14 at 6-9.)

> "[A] claimant's subjective complaints of pain cannot in and of themselves serve as conclusive evidence of disability.  The record must document by medically acceptable clinical or laboratory diagnostic techniques the existence of a medical impairment which could reasonably be expected to produce the disabling pain." *Chester*, 792 F.2d [at 132].  A three-part "pain standard" applies when a claimant attempts to establish disability through his own testimony of pain or other subjective symptoms.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).  The pain standard

---

[11]     For a summary of the Plaintiff's gynecological treatment see Section III above.

requires: (1) evidence of an underlying medical condition, and either (2) objective medical evidence confirming the severity of the alleged pain arising from that condition, or (3) the objectively determined medical condition is of such a severity it can be reasonably expected to give rise to the alleged pain. *Id.*

When a claimant testifies to subjective complaints of pain, the ALJ must clearly articulate adequate reasons for discrediting the claimant's allegations of disabling symptoms. *Dyer*, 395 F.3d [at 1210]. In articulating his reasons, the ALJ need not specifically refer to every piece of evidence, so long as the decision "is not a broad rejection which is not enough to enable the district court or [, if necessary, the court of appeals] to conclude that the ALJ considered [the] medical condition as a whole." *Id.* at 1210–11 (quotation omitted). A clearly articulated credibility determination supported by substantial evidence will not be disturbed. *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).

*Petteway v. Comm'r of Soc. Sec.*, 353 F. App'x 287, 288-89 (11th Cir. Nov. 18, 2009) (per curiam) (some internal citations modified).

Further, as to an ALJ's credibility determination, as one court explained in the context of discussing the three-part pain standard (first adopted in *Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986)), as long as "the implication [is] obvious to the reviewing court[,] . . . the Eleventh Circuit does not require an explicit finding as to the claimant's credibility[.]" *Sharpe v. Astrue*, No. 5:07cv74/RS-MD, 2008 WL 1805436, at *6 (N.D. Fla. Apr. 15, 2008) (citing *Dyer*, 395 F.3d at 1210). And, moreover, as to the *Hand* three-part pain standard,

[t]he Eleventh Circuit has approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529 [or § 416.929], because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." *Wilson*, 284 F.3d at 1226. Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

*Id.*

Here, the ALJ "[found] that the [Plaintiff's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment."  (R. 18.)  The ALJ cited the applicable regulations (§§ 404.1529 and 416.929 (*see id.* at 14)) and provided sound reasons for finding the Plaintiff less than credible with respect to her complaints regarding the intensity, persistence and limiting effects of her pain, (*see id.* at 14-18).

Specifically, the ALJ repeatedly noted that the Plaintiff was not prescribed narcotics for her pain.  (*Id.* at 15-17.)  The ALJ also discussed the inconsistency between the medical treatment pursued by the Plaintiff and her allegations of pain.  (*Id.* at 11, 14-18.)  The ALJ stated that, during the four-year period contemporary with the date of onset, May 2010, the Plaintiff only had five visits for medical care.  (*Id.* at 11.)  The December 9, 2008 visit was the only visit in which the Plaintiff reported specific complaints of low back pain and hip pain radiating down her leg, and she reported that she had been experiencing those symptoms for two to three days only.  (*Id.* at 15.)  The ALJ commented that the Plaintiff did not report a chronic or ongoing impairment.  (*Id.*)  The ALJ stated that the Plaintiff's next medical visit was not until December 11, 2009, and at that visit "she <u>did not mention</u> any problems involving her back, neck, hips, or feet.  The lack of care over the course of a year, combined with her actual complaints at the end of that year, strongly suggest that there was no chronic impairment and limitation."  (*Id.* (emphasis in original) (citations omitted).)  The ALJ noted that, during her next medical visit, in June 2010, the Plaintiff "made no reference to neck, back, hip or leg pain."  (*Id.* at 16.)  At her next visit, in April 2011, she complained of a history of hip problems and diffuse pain; however, "[t]he examiner did not report any indication

for diffuse pain." (*Id.* at 17.) The ALJ states that, at the time of her last medical visit in June 2011, she reported a history of back problems, but she was not diagnosed with any back problems or treated for any back problems. (*Id.*) After considering all the evidence, the ALJ stated that he

> considered the claimant's testimony and written reports of limitation (i.e. the functional report). Although the claimant asserts greater limitation, her subjective reports are simply not supported by or consistent with the medical and objective evidence of record. Her subjective reports standing alone cannot overcome the remaining evidence.

(*Id.* at 18.)[12]

Thus, the ALJ referenced the applicable regulation and has, moreover, "articulated [a] credibility determination supported by substantial evidence[.]" *Petteway*, 353 F. App'x at 289; *accord Wiggins v. Astrue*, No. CA 11-00565-C, 2012 WL 3631092, at *7 (S.D. Ala. Aug. 22, 2012). As such, the Court rejects any argument that the ALJ failed to follow the applicable pain standard.[13]

---

[12] The Plaintiff argues that the ALJ's determination is not supported by substantial evidence because the ALJ failed to consider the MRI from 2002 that showed a disc protrusion at L5-S1. (Doc. 14 at 6-8.) However, the ALJ did not discuss the MRI performed nine years prior because he focused on the evidence from the relevant time period—the years just before and just after the date of onset. (*See* R. 11) It was appropriate for the ALJ to focus on the medical records from the relevant time period. *See Homrighouse v. Astrue*, No. 5:08-cv-374-Oc-GRJ, 2009 WL 3053705, *9-10 (M.D. Fla. Sept. 18, 2009); *Schiano v. Astrue*, No. 07-61920-CIV, 2009 WL 1770152, *4 (S.D. Fla. June 23, 2009). Furthermore, the ALJ's discounting of the 2002 MRI is supported by the opinion of the medical expert who testified that the 2002 MRI was not clinically significant because it was nearly a decade old. (R. 40.)

[13] The Plaintiff argues that the ALJ erred by failing to discuss the following seven factors for assessing credibility set forth in 20 C.F.R. § 404.1529 and SSR 96-7p:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medications used to alleviate pain or other symptoms; (5) treatment other than medication, received for relief of pain or other symptoms; (6) any measures, other than treatment, used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.

## VI.    Conclusion

Accordingly, it is **ORDERED** that the decision of the Commissioner of Social Security denying the Plaintiff benefits be **AFFIRMED**.

**DONE and ORDERED** this the 10th day of October 2014.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

---

(Doc. 14 at 8-9 (citing 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p).)  Although the ALJ did not explicitly discuss each factor, he stated that he considered the factors when he assessed the evidence in this case, (*see* R. 14).  Furthermore, under the law of the Eleventh Circuit, the ALJ was not required to explicitly discuss the seven factors.  *Ruscito v. Astrue*, No. 3:08-cv-518-J-MCR, 2009 WL 1841592, at *6 n.9 (M.D. Fla. June 24, 2009); *Bechtold v. Massanari*, 152 F. Supp. 2d 1340, 1349 n.9 (M.D. Fla. 2001); *see Dyer*, 395 F.3d at 1210-12 (requiring articulated reasons for discrediting subjective pain testimony, but not requiring application of the seven factors); *Foote*, 67 F.3d at 1560-62 (same).